UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR: 419-150 |
| | ) | |
| DALI BAGROU | ) | |
| | ) | |

PLEA AGREEMENT

Defendant Dali Bagrou, represented by his counsel Joshua Sabert Lowther, and the United States of America, represented by Assistant United States Attorneys Jennifer G. Solari and Steven H. Lee, have reached a plea agreement in this case. The terms and conditions of that agreement are as follows.

1.   Guilty Plea

Defendant agrees to plead guilty to Count One of the Third Superseding Indictment, which charges a violation of 18 U.S.C. § 371.

2.   Elements and Factual Basis

The elements necessary to prove the offense charged in Count One are (1) two or more persons in some way agreed to try to accomplish a shared and unlawful plan; (2) Defendant knew the unlawful purpose of the plan and willfully joined in it; (3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and (4) the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

Defendant agrees that he is, in fact, guilty of this offense.  He agrees to the accuracy of the following facts, which satisfy each of the offense's required elements:

### Parties Involved

A. **Company A**, the identity of which is known to the parties and to the Court, was a multinational company that specialized in industrial manufacturing. Company A operated offices and production facilities throughout the United States.

B. **WORLD MINING AND OIL SUPPLY ("WMO")** advertised as a sourcing and supply company that specialized in industrial, mining, and oil and gas products.  Its corporate office was located in Dacula, Georgia.

C. **DALI BAGROU** was the President, Owner and Managing Director of Defendant WMO and operated from the WMO offices in Dacula, Georgia.

D. **GVA INTERNATIONAL OIL AND GAS SERVICES (a/k/a "GVA INTERNATIONAL DMCC")**, based in Italy, was a business that offered services in electrical engineering, mechanical and HVAC engineering, and energy and communication systems in the oil/gas, petrochemical, manufacturing and energy industries.

E. **GABRIELE VILLONE** was the Commercial Director and Manager of Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES**.

F. **BRUNO CAPARINI** was the Commercial Director of an Italian engineering and construction company based in Italy.

G. **KS ENGINEERING** (a/k/a **"KS-INZHINIRING CO. LTD."** and **"KS-INZHINIRING, LLC,"**) was an engineering service company based in St. Petersburg, Russia, that specialized in systems for coal, gas, oil, nuclear and renewable energy power plants.

H. **ANTON CHEREMUKHIN** was an employee of Defendant **KS ENGINEERING**.

I. **OLEG VLADISLAVOVICH NIKITIN** was the General Director of Defendant **KS ENGINEERING**.

J. **Company B**, the identity of which is known to the parties and to the Court, was a Russian government-controlled business based in Moscow and St. Petersburg, Russia, that engaged in the extraction, production, transportation and sale of oil and gas.

## The Commodity

K.  The commodity at issue ("the Commodity") was a Vectra 40G power turbine designed and manufactured for integration with gas generators to enable direct drive of high power gas compressors.

## Licensing Requirements and Status

L.  The U.S. Department of Commerce required an export license for the export of the Commodity when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to

3

determine whether the item would be used in such projects. (15 C.F.R. Part 746.5 ("Russian Industry Sector Sanctions")).

M. At no time did the defendants, **WORLD MINING AND OIL SUPPLY ("WMO")**, **DALI BAGROU**, **GVA INTERNATIONAL OIL AND GAS SERVICES**, **BRUNO CAPARINI**, **KS ENGINEERING**, **ANTON CHEREMUKHIN**, **OLEG VLADISLAVOVICH NIKITIN**, G.V. or Company B apply for, receive or possess a license or authorization from The Department of Commerce - BIS, to export the Commodity.

## COUNT ONE
*Conspiracy*
U.S.C. § 371

N.      Beginning on a date unknown, but at least in or around September

2017, and continuing until on or about August 28, 2019, in Chatham and Richmond

Counties, within the Southern District of Georgia, and elsewhere, the defendant,

**DALI BAGROU**, did knowingly and willfully combine, conspire, confederate, and

agree with other persons to commit certain offenses, to wit:

    a. Violation of IEEPA, in that the defendant conspired to willfully export,
attempt to export, and attempt to cause the export of the Commodity from
the United States when the Commodity would be used directly or indirectly
in exploration for, or production of, oil or gas in Russian deepwater (greater
than 500 feet) or Arctic offshore locations or shale formations, or when one
was unable to determine whether the item would be used in such projects,
without first having obtained the required licenses or authorizations from
BIS, in violation of Title 50, United States Code, Sections 1702 and 1705;
and 15 C.F.R. Part 746.5 and 764.2(a)-(k);

    b. Violation of ECRA, in that the defendant conspired to willfully export,
attempt to export, and cause the export of the Commodity from the United
States when the Commodity would be used directly or indirectly in
exploration for, or production of, oil or gas in Russian deepwater (greater
than 500 feet) or Arctic offshore locations or shale formations, or when one
was unable to determine whether the item would be used in such projects,

without first having obtained the required licenses or authorizations from BIS, in violation of 50 U.S.C. § 4819 and 15 C.F.R. Part 746.5 and 764.2(a)-(k); and

c. Smuggling, in that the defendant conspired to fraudulently and knowingly export and send, and attempt to cause to be exported and sent, from the United States, merchandise, articles, and objects contrary to a law and regulation of the United States, that is, Title 18, United States Code, Sections 1343, and 50 U.S.C. §§ 1705 and 4819, in violation of Title 18, United States Code, Section 554.

d. Conspiracy to defraud the Department of Commerce by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to restricted parties without authorization or a license, by deceit, craft, trickery, and dishonest means.

## Objects of the Conspiracy

O. The objects of the conspiracy were:

  a. to illegally enrich the conspirators by unlawfully exporting goods from the United States;

  b. to evade the regulations, prohibitions, and licensing requirements of the IEEPA, the ECRA, and the EAR; and

6

    c. to conceal the prohibited activities from Company A and the United States Government so as to avoid penalties and disruption of the illegal activity.

## Manner and Means of the Conspiracy

P. It was a part of the conspiracy and among its manner and means that some of the defendants, aided and abetted by each other and others:

    a. entered into contracts for the purpose of procuring the Commodity from Company A;

    b. knowingly included materially false information in the contracts to obscure the true end user and end use of the Commodity;

    c. knowingly created additional false corporate documents and business plans to further obfuscate the intended end user and end use of the Commodity;

    d. knowingly provided Company A materially false and fraudulent information regarding the end user and end use of the Commodity;

    e. transmitted and caused to be transmitted email communications by wire in interstate and foreign commerce; and

    f. transmitted and caused to be transmitted monetary payments by wire in interstate and foreign commerce.

**Overt Acts**

Q. In furtherance of the conspiracy and to accomplish its objects, the
defendant **DALI BAGROU** and others caused to be committed, in the
Southern District of Georgia and elsewhere, at least one of the following
overt acts:

a. On or about September 14, 2017, **DALI BAGROU** contacted Company
A via email and requested a service manual for the Commodity, stating
that the company he represented wanted to couple it with a General
Electric gas generator model LM2500 (the "LM2500 Gas Generator").
Company A replied that it would only share its proprietary information
with bona fide end users of the Commodity or their authorized agents.

b. On or about October 18, 2017, **BAGROU** falsely responded to
Company A via email that his company, WMO, would be the end user
of the Commodity and that it would be used in Atlanta, Georgia.

c. On or about October 24, 2017, Company A replied to **BAGROU** that it
knew the Commodity would not be installed in Atlanta, Georgia, and
reiterated that Company A required full disclosure of end use/end user
information "to comply with EU/US export law."  On the same date,
**BAGROU** forwarded Company A's email to **GABRIELE VILLONE**.

d. On or about October 24, 2017, **VILLONE** drafted a series of materially false responses and other information, such as, "[the Commodity] will be buy (sic), delivered, 'installed' literally in United States Atlanta facilities," and "no export outside US." **VILLONE** emailed the response to **BAGROU** and directed him to send it to Company A.

e. On or about February 27, 2018, **KS ENGINEERING**, by and through **ANTON CHEREMUKHIN** and **OLEG VLADISLAVOVICH NIKITIN**, sent a draft contract proposal to **GVA INTERNATIONAL OIL AND GAS SERVICES**, by and through **VILLONE**. In the contract, **GVA INTERNATIONAL OIL AND GAS SERVICES** agreed to obtain and sell the Commodity to **KS ENGINEERING**. The agreement falsely stated that the Commodity would be used at the "Mordovskiy sugar factory, LLC," in Russia, which the parties to the contract and their representatives knew to be false.

f. On or about March 5, 2018, **KS ENGINEERING**, by and through **CHEREMUKHIN** and **NIKITIN**, submitted a technical proposal to Company B, in which **KS ENGINEERING** proposed to provide the Commodity to Company B for use with the LM2500 Gas Generator as part of a Turbogenerator on the Prirazlomnaya Marine Ice-Resistant Stationary Platform.

g. On or about June 22, 2018, with the advice and direction of **VILLONE**, **BAGROU** contacted Company A and again inquired about purchasing the Commodity.  **BAGROU** told Company A it was for a power plant that **BAGROU** was purportedly planning to build near Atlanta, Georgia.  In fact, as **VILLONE** and **BAGROU** then knew, **BAGROU** had no plans to build a power plant in Georgia.

h. On or about July 19, 2018, **VILLONE** sent a letter on behalf of **GVA INTERNATIONAL OIL AND GAS SERVICES** to **KS ENGINEERING**, confirming **GVA INTERNATIONAL OIL AND GAS SERVICES's** receipt of **KS ENGINEERING**'s advance payment on May 8, 2018, and predicting delivery of the Commodity and other components to **KS ENGINEERING** on November 1, 2018.

i. On or about July 20, 2018, **CHEREMUKHIN** forwarded **VILLONE's** letter to Company B's Deputy Head of Office, Head of the MTR Supply Department, Office of Material and Technical Provision.

j. On or about July 23, 2018, **BAGROU**, with the assistance and direction of **VILLONE**, provided Company A with an affidavit and description of a proposed plan to use the Commodity to build a power unit generator in Savannah, Georgia, which plan **VILLONE** and **BAGROU** knew was fictitious and false.

10

k. On or about September 18, 2018, **VILLONE** emailed
   **CHEREMUKHIN** the fictitious and false affidavit and business plan
   submitted to Company A as evidence that **BAGROU** and **VILLONE**
   could successfully procure the Commodity from Company A.

l. On or about September 30, 2018, **VILLONE** emailed **BAGROU** a
   series of instructions regarding additional false and fictitious
   information **BAGROU** was to provide to Company A.

m. On or about October 15, 2018, **VILLONE** emailed **BAGROU** a
   contract between **GVA INTERNATIONAL OIL AND GAS**
   **SERVICES** and **BAGROU's** company, which contract purported to
   establish a joint venture to build a "portable temporary generation
   power project." As **VILLONE** and **BAGROU** then knew, no such
   project was actually contemplated and the phony contract was created
   for the purpose of deceiving Company A.

n. On or about November 1, 2018, **VILLONE** emailed **BAGROU** another
   series of instructions regarding additional false and fictitious
   information **BAGROU** was to provide to Company A.

o. On or about November 22-December 2, 2018, **BAGROU** traveled to
   Dubai, UAE, to meet with **VILLONE** and **CHEREMUKHIN**
   regarding the purchase of The Commodity.

p.  On or about November 24, 2018, **VILLONE** sent a payment, which originated outside the U.S., from **GVA INTERNATIONAL OIL AND GAS SERVICES** to **BAGROU's** company in the amount of $980,000.00 USD.  **VILLONE** then emailed **BAGROU**, "first payment as per our contract 15 oct 2018 [The Commodity] 980,000 has been sent."

q.  On or about November 28, 2018, with the advice and direction of **VILLONE**, **BAGROU** sent proof of $980,000.00 USD in available funds to Company A and asked for a formal proposal to finalize the sale of the Commodity.

r.  On or about December 11, 2018, after **BAGROU** sent several more inquiries to Company A, **VILLONE** forwarded the inquiries to **CHEREMUKHIN** and cautioned him to wait for Company A's response, stating, "Daily we are pushing them."

s.  On or about December 13, 2018, **VILLONE** sent multiple payments, which originated outside the U.S., from **GVA INTERNATIONAL** to **BAGROU's** company, totaling $1,000,000.00 USD, purportedly for "for the project energy [the Commodity]."

t.  On or about December 13, 2018, **VILLONE** emailed **BAGROU** to notify **BAGROU** of the deposit "from our account in Raiffeisen fast wire (BNP Paribas) Pol #1,000,000 one million usd[.]"

12

u.  On or about December 14, 2018, **VILLONE** emailed

**CHEREMUKHIN** to inform him about the $1,000,000.00 USD

transfer to **BAGROU's** company.

v.  On or about December 26, 2018, **VILLONE** requested the assistance of

an engineer to assure Company A about the feasibility of the purported

energy project, falsely telling the engineer that **BAGROU's** company

was the end user of the Commodity and providing the engineer with

the false and fictitious business plan.

w.  On or about December 29, 2018, **VILLONE** emailed **BAGROU** a

response to Company A's questions about the purported energy project,

which **VILLONE** and **BAGROU** both knew contained materially false

and misleading information.  **VILLONE** instructed **BAGROU** to

"remember to save my file in your computer open it and save again

then send what you have save (sic)!  don't send this file attached

directly (my file (sic) are with my computer id)."

x.  On or about February 8, 2019, **BAGROU** received and forwarded a budgetary proposal from Company A for the purchase of the Commodity at $7,500,000.00 USD, which **BAGROU** forwarded to **VILLONE**.  **VILLONE** then forwarded the proposal (with the Company A price redacted) to **CHEREMUKHIN**.  **VILLONE** informed **CHEREMUKHIN** that the price for the Commodity was higher than expected because it was no longer in production and because it was under a "strict end user control."

y.  On or about February 23, 2019, after additional questions about the purported energy project from Company A, and after consultation with **VILLONE**, **BAGROU** spoke with an Undercover Agent ("UCA") located in Savannah, GA, and told the UCA that he would like to purchase the Commodity from a company other than Company A.

z.  On or about March 8, 2019, following further conversation with the UCA and after consultation with **VILLONE**, **BAGROU** sent Company A an email confirming he was no longer interested in purchasing the Commodity through Company A.  On the same date, **BAGROU** reached an agreement with the UCA to purchase the Commodity through the UCA's company.

aa. On or about April 6, 2019, **VILLONE** drafted an email to the UCA which he instructed **BAGROU** to send, in which **VILLONE** and **BAGROU** agreed to purchase the Commodity from the UCA's company for $6,500,000.00 USD.

bb. On or about May 8, 2019, **VILLONE** forwarded **CHEREMUKHIN** photographs of the Commodity and stated, "tomorrow i will travel to USA . . . to meet [the UCA] personally in Georgia. . . . I decided to go personally due to the sensitive step of the deal." **VILLONE** also forwarded pictures of the Commodity to **CAPARINI**.

cc. On or about May 10, 2019, **VILLONE** and **BAGROU** met with the UCA in Augusta, GA, to discuss the sale of the Commodity to **BAGROU's** company. The parties agreed that **BAGROU** and **VILLONE** would provide a $2,750,000.00 USD down payment to the UCA's company toward purchase of The Commodity.

dd. On or about May 13, 2019, **VILLONE**, on behalf of **GVA INTERNATIONAL OIL AND GAS**, sent **CHEREMUKHIN** and **KS ENGINEERING** a letter summarizing his meeting with the UCA.  In his letter, **VILLONE** wrote, "My personal impression of [the UCA] after 2 hours of discussion is that he is a REAL manager involved in [Company A] business and he considerate (sic) us a very interesting USA 'customer' for our energy production program. He believe (sic) that.  He AWARE US (sic) that ROSNEFCompany linked from Russia contacted AGAIN ONE MONTH AGO ASKING FOR [THE COMMODITY] from Russia!!!!!  Of course [Company A] refuse (sic) but the attention is still very high.  Therefore please ask client TO STOP ASKING FOR [THE COMMODITY] We have [the Commodity] now with this way."

ee. On or about June 26, 2019, **BAGROU**, with the advice and direction of **VILLONE**, wired a total of $2,750,000.00 USD, which funds had been previously transferred from a bank account in Poland into a bank account controlled by **BAGROU**, to an account belonging to the UCA's company inside the United States.

ff. On or about August 17, 2019, **BAGROU** engaged in a telephone conversation with the UCA about purchase of The Commodity in which the UCA told **BAGROU** that The Commodity was going to Company B and that The Commodity "can't go there legally."

gg. On or about August 19, 2019, **BAGROU** engaged in a telephone conversation with the UCA about purchase of The Commodity in which **BAGROU** acknowledged reading an email from the UCA stating, "Per [Company A] Compliance, [Company B] was added to the Department of Commerce's Entity List in 2014.  Although these [Commodities] are EAR99, they would still require a Commerce License to be exported to [Company B], Prirazlomloye.  We know that is where these will be used; I won't apply for a license as one will not be approved."

hh. On or about August 25, 2019, **BAGROU** engaged in a telephone conversation with the UCA in which the UCA told **BAGROU** that breaking sanctions rules "will put all of us in jail," or words to that effect.  **BAGROU** told the UCA to calm down, and stated, "Now, obviously, I know we got some regulation, this, this, this, all of those things.  We were trying to avoid that at maximum."

ii. On or about August 27, 2019, **VILLONE** flew from outside the U.S. to Savannah, Georgia, to meet with the UCA and **BAGROU** to finalize the purchase of the Commodity.

jj. On or about August 28, 2019, **VILLONE** and **BAGROU** met with the UCA and another undercover agent in Savannah, Georgia, to discuss the sale of the Commodity.  During the meeting, **VILLONE** discussed how the UCAs should falsify the shipping documents for the Commodity to conceal the true end use and user.

17

All in violation of Title 18, United States Code, Sections 371 and 2.

3.      Possible Sentence

Defendant's guilty plea will subject him to the following maximum possible sentence: 5 years' imprisonment, 3 years' supervised release, a $250,000 fine, such restitution as may be ordered by the Court, and forfeiture of all forfeitable assets. The Court additionally must impose a $100 special assessment per count of conviction.

4.      No Promised Sentence

No one has promised Defendant that the Court will impose any particular sentence or a sentence within any particular range.  The Court is not bound by any estimate of sentence given or recommendations made by Defendant's counsel, the government, the U.S. Probation Office, or anyone else.  The Court may impose a sentence up to the statutory maximum. Defendant will not be allowed to withdraw his plea of guilty if he receives a more severe sentence than he expects.

5.      Court's Use of Sentencing Guidelines

The Court is obligated to use the United States Sentencing Guidelines to calculate the applicable guideline range for Defendant's offense.  The Sentencing Guidelines are advisory; the Court is not required to impose a sentence within the range those Guidelines suggest.  The Court will consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), in determining the Defendant's sentence.  The Sentencing Guidelines are based on all of Defendant's relevant conduct, pursuant to U.S.S.G. §

1B1.3, not just the conduct underlying the particular Count or Counts to which Defendant is pleading guilty.

6.   Agreements Regarding Sentencing Guidelines

      a.   Use of Information

Nothing in this agreement precludes the government from providing full and accurate information to the Court and U.S. Probation Office for use in calculating the applicable Sentencing Guidelines range.  Any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable Guidelines range, pursuant to Section 1B1.8 of the Sentencing Guidelines.

      b.   Acceptance of Responsibility

If the Court determines that Defendant qualifies for an adjustment under U.S.S.G. § 3E1.1(a), and the offense level prior to operation of § 3E1.1(a) is 16 or greater, the government will move for an additional one-level reduction in offense level pursuant to Section 3E1.1(b) based on Defendant's timely notification of his intention to enter a guilty plea.

7.   Agreement Not to Prosecute

The government agrees not to prosecute Defendant for other offenses committed in the Southern District of Georgia prior to the date of this agreement, which are of the same or similar character as those cited herein, with the understanding by Defendant that no limitation shall be placed upon the Court's consideration of information concerning the background, character, and conduct of Defendant for the purpose of imposing an appropriate sentence, and such other

offenses may be considered as relevant conduct pursuant to Section 1B1.3 of the United States Sentencing Guidelines and Fed R. Crim. P. 8(a).  Furthermore, the government will make a recommendation to the U.S. Department of Commerce, Bureau of Industry and Security, that it not pursue administrative penalties against Defendant for alleged violations of 13 U.S.C. § 305 that occurred prior to the date of this agreement, which are the same or similar character as those offenses cited herein.

8.    <u>Forfeiture</u>

a.    Defendant agrees to forfeit his interest in any property, real or personal, which constitutes or is derived from proceeds traceable to the Title 18 offense to which he has agreed to plead guilty, including the property located at 9545 Stoney Ridge Lane, Alpharetta, Georgia 30022-7801 (hereinafter, the "Subject Property").

b.    Defendant waives and abandons all right, title, and interest in the Subject Property.  Defendant agrees to take all steps requested by the government to facilitate transfer of title of the Subject Property to the government.  Defendant further agrees not to file any claim, answer, or petition for remission or mitigation in any administrative or judicial proceeding pertaining to the Subject Property.  If any such document has already been filed, Defendant hereby withdraws that filing.

c.    Defendant agrees to hold the government and its agents and employees harmless from any claims made in connection with the seizure, forfeiture, or disposal of property connected to this case. Defendant further agrees to waive the requirements of the Federal Rules of Criminal Procedure 32.2 and 43(a) regarding

notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

      d.    Defendant waives and abandons his interest in any other property that may have been seized in connection with this case. Additionally, Defendant waives any and all challenges on any grounds to the seizure, forfeiture, and disposal of any property seized in connection with this case. Defendant specifically agrees to waive any challenges arising under the Double Jeopardy Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

9.    <u>Financial Obligations and Agreements</u>

      a.    <u>Special Assessment</u>

Defendant agrees to pay a special assessment in the amount of $100, payable to the Clerk of the United States District Court, which shall be due immediately at the time of sentencing.

      b.    <u>Required Financial Disclosures</u>

By the date that Defendant enters a guilty plea, Defendant shall complete a financial disclosure form listing all his assets and financial interests, whether held directly or indirectly, solely or jointly, in his name or in the name of another. Defendant shall sign the financial disclosure form under penalty of perjury and provide that form to the Financial Litigation Unit of the United States Attorney's Office and to the United States Probation Office. Defendant authorizes the United States to obtain credit reports on Defendant and to share the contents of those reports with the Court and the United States Probation Office. Defendant also authorizes

21

the United States Attorney's Office to inspect and copy all financial documents and information held by the United States Probation Office.

      c.    <u>Financial Examination</u>

Defendant will submit to an examination under oath on the issue of his financial disclosures and assets if deemed necessary by the United States. Such examination will occur not later than 30 days after the entry of Defendant's guilty plea.

      d.    <u>No Transfer of Assets</u>

Defendant certifies that he has made no transfer of assets in contemplations of this prosecution for the purpose of evading or defeating financial obligations created by this Agreement or that may be imposed upon him by the Court at sentencing. Defendant promises that he will make no such transfers in the future.

      e.    <u>Material Change in Circumstances</u>

Defendant agrees to notify the United States of any material change in circumstances, as described in 18 U.S.C. § 3664(k), that occurs prior to sentencing in this case. Such notification will be made within seven days of the event giving rise to the changed circumstances, and in no event later than the date of sentencing.

      f.    <u>Enforcement</u>

Any payment schedule imposed by the Court is without prejudice to the United States to take all actions and remedies available to it to collect the full amount of the financial obligations imposed by the judgment of the Court in this case. Defendant understands and agrees that the financial obligations and forfeiture imposed by the

judgment of the Court in this case will be placed on the Treasury Offset Program so that any federal payment that Defendant receives may be offset and applied to the judgment debt without regard to or affecting any payment schedule imposed by the Court.

10.   <u>Waivers</u>

   a.   <u>Waiver of Appeal</u>

Defendant entirely waives his right to a direct appeal of his conviction and sentence on any ground (including any argument that the statute to which the defendant is pleading guilty is unconstitutional or that the admitted conduct does not fall within the scope of the statute).  The only exceptions are that the Defendant may file a direct appeal of his sentence if (1) the court enters a sentence above the statutory maximum, (2) the court enters a sentence above the advisory Sentencing Guidelines range found to apply by the court at sentencing; or (3) the Government appeals the sentence.  Absent those exceptions, Defendant explicitly and irrevocably instructs his attorney not to file an appeal.

   b.   <u>Waiver of Collateral Attack</u>

Defendant entirely waives his right to collaterally attack his conviction and sentence on any ground and by any method, including but not limited to a 28 U.S.C. § 2255 motion.  The only exception is that Defendant may collaterally attack his conviction and sentence based on a claim of ineffective assistance of counsel.

   c.   <u>FOIA and Privacy Act Waiver</u>

Defendant waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any record pertaining to the investigation or prosecution of this case under the authority of the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a, and all subsequent amendments thereto.

      d.    <u>Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 Waiver</u>

Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence ordinarily limit the admissibility of statements made by a defendant during the course of plea discussions or plea proceedings. Defendant knowingly and voluntarily waives the protections of these rules. If Defendant fails to plead guilty, or his plea of guilty is later withdrawn, all of Defendant's statements in connection with this plea, and any leads derived therefrom, shall be admissible for any and all purposes.

11.    <u>Defendant's Rights</u>

Defendant has the right to be represented by counsel, and if necessary have the court appoint counsel, at trial and at every other critical stage of the proceeding. Defendant possesses a number of rights which he will waive by pleading guilty, including: the right to plead not guilty, or having already so pleaded, to persist in that plea; the right to a jury trial; and the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

12.    <u>Satisfaction with Counsel</u>

Defendant has had the benefit of legal counsel in negotiating this agreement. Defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice given and the work performed by his attorney.

13.   Breach of Plea Agreement

If Defendant fails to plead guilty, withdraws or attempts to withdraw his guilty plea, commits any new criminal conduct following the execution of this agreement, or otherwise breaches this agreement, the government is released from all of its agreements regarding Defendant's sentence, including any agreements regarding the calculation of Defendant's advisory Sentencing Guidelines.   In addition, the government may declare the plea agreement null and void, reinstate any counts that may have been dismissed pursuant to the plea agreement, and/or file new charges against Defendant that might otherwise be barred by this plea agreement. Defendant waives any statute-of-limitations or speedy trial defense to prosecutions reinstated or commenced under this paragraph.

14.   Entire Agreement

This agreement contains the entire agreement between the government and Defendant.

DAVID H. ESTES
ACTING UNITED STATES ATTORNEY

_____                    _____
Date                           Karl I. Knoche
                               Chief, Criminal Division

25

7/29/21

Date

Jennifer G. Solari
Senior Litigation Counsel
Assistant United States Attorney

7/29/21

Date

Steven H. Lee
Assistant United States Attorney

I have read and carefully reviewed this agreement with my attorney. I understand each provision of this agreement, and I voluntarily agree to it. I hereby stipulate that the factual basis set out therein is true and accurate in every respect.

July 29, 2021
Date

Dali Bagrou, Defendant

I have fully explained to Defendant all of his rights, and I have carefully reviewed each and every part of this agreement with him. I believe that he fully and completely understands it, and that his decision to enter into this agreement is an informed, intelligent, and voluntary one.

July 20, 2021

Date
Attorney

Joshua Sabert Lowther, Defendant's

27